T.C. Summary Opinion 2004-139

UNITED STATES TAX COURT

GARY W. AND DARLENE E. WHITE, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 414-03S.                    Filed October 12, 2004.

Gary W. and Darlene E. White, pro sese.

Robert S. Scarbrough, for respondent.


ARMEN, Special Trial Judge:  This case was heard pursuant to
the provisions of section 7463 of the Internal Revenue Code in
effect at the time the petition was filed.[1]  The decision to be
entered is not reviewable by any other court, and this opinion
should not be cited as authority.

_____

[1]  Unless otherwise indicated, all subsequent section
references are to the Internal Revenue Code in effect for 1999
and 2000, the taxable years in issue.  All Rule references are to
the Tax Court Rules of Practice and Procedure.

Respondent determined deficiencies in petitioners' Federal income taxes of $1,568 and $3,696 for the taxable years 1999 and 2000, respectively.

After respondent's concessions,[2] the issue for decision is whether the losses petitioners incurred in their sailboat charter business are subject to the passive activity loss rules of section 469.  We hold that they are.

Background

Some of the facts have been stipulated, and they are so found.  We incorporate by reference the parties' stipulation of facts and accompanying exhibits.

At the time that the petition was filed, petitioners resided in Kirkland, Washington.  (References to petitioners individually are to Mr. White or Mrs. White.)

During the years in issue, Mr. White was employed full time as a glazing estimator, and Mrs. White was employed full time as a project coordinator.

At a time not disclosed in the record, petitioners started a sailboat charter business called GW Rentals, which they operated throughout the years in issue.  The sailboat used in petitioners' business during the years in issue was a 1998 42-foot Catalina

---

[2]  Respondent concedes that: (1) Petitioners' sailboat charter activity is a trade or business; and (2) petitioners incurred net losses from their sailboat charter business of $5,593 for 1999 and $13,186 for 2000.

sailboat named <u>Moonshadow</u>.[3]  Petitioners purchased <u>Moonshadow</u> new in December 1997 for approximately $185,000, at which time they traded in their former 36-foot Catalina sailboat.[4]

<u>Moonshadow</u> is a single sloop mast sailboat with a diesel engine.  It features, among other things, two double-berth staterooms, two cabins, two toilet compartments, and a galley complete with a microwave, refrigerator, freezer, three-burner propane gas stove with oven, and hot and cold running water. <u>Moonshadow</u> also has on board a global positioning system with chart plotter, an Autohelm navigation system, a Freedom 20 inverter system, a TV/DVD, and a complete stereo system with speakers in front and in back.  Petitioners took possession of <u>Moonshadow</u> in March 1998, and have remained the sole owners of it throughout the years in issue.

During the years in issue, petitioners docked <u>Moonshadow</u> at the Anacortes Marina, which was operated by Anacortes Yacht Charters (AYC), a charter company.[5]  Petitioners initially

---

[3]  Petitioners have owned various Catalina sailboats for the past 40 years.  Mr. White is also an experienced sailor who built his first boat at the age of 13 and crewed on boats racing in the Columbia River.

[4]  Petitioners apparently did not pay Washington State sales tax when they purchased <u>Moonshadow</u> based on their declaration to the Washington State Revenue Department that the sailboat was purchased for charter purposes and not for personal use.

[5]  AYC has a fleet of 110 boats, including <u>Moonshadow</u>, available for charters.  AYC also maintains skippers and crews
(continued...)

entered into a yacht owners' contract with AYC on May 26, 1998, granting AYC the exclusive right to charter Moonshadow as a bare boat charter.[6]  This contract continued until January 31, 1999, when petitioners signed a new contract with AYC under terms substantially similar to the prior year's contract.  This contract was automatically renewed and remained in effect for the year 2000.  Under this contract, AYC had the exclusive right to lease Moonshadow and to further sublease it to third-party charterers.  The lease granted AYC possession, dominion, and control over the vessel.  The terms of the contract provided that AYC was responsible for the day-to-day management and operation of Moonshadow to include: (1) Arranging charters through advertising, boat show displays, distribution of brochures, and AYC's internet site;[7] (2) providing certain services, to include cleaning and inspection, provisioning and ground transportation, and the personnel needed to perform these services; (3) handling all reservations, collection of charter fees, Washington State sales tax, daily insurance fund and service fees, payment of

---

[5](...continued)
for hire.

[6]  A bare boat charter means that the charter party receives a seaworthy vessel in "bare" condition; i.e., the charter party provides its own skipper, bears the cost of supplies and voyage costs such as fuel and port charges, and is directly responsible for operating and maintaining the vessel during the charter.

[7]  Petitioners pay a separate fee to list and update a link for Moonshadow on AYC's internet site.

Washington State sales tax to the State, and disbursement of funds to petitioners; and (4) performing necessary repairs or maintenance to make <u>Moonshadow</u> charter ready.[8]  For these services, petitioners paid AYC a commission, after deducting the turn fee, of 30-percent of the gross charter fee (or 20-percent of the gross charter fees for charters arranged by petitioners).[9] The contract further provided that petitioners:  (1) Reserved no right to nonbusiness private use of <u>Moonshadow</u>; (2) agreed to pay AYC a commission of 5-percent if they leased <u>Moonshadow</u> for personal use; and (3) agreed to insure <u>Moonshadow</u> at their own expense under the AYC group insurance program.

Typically, AYC's contracts with individual charterers set forth the terms of a charter period as follows:

> A CHARTER WEEK is 7 days/6 nights.  Example: Noon
> Sunday to Noon Saturday.  Daily pro-rated items are
> based on number of days in charter.

At the end of each month, AYC would mail petitioners a detailed income activity statement indicating the name of the charterer,

---

[8]  The contract authorized AYC to spend up to $500 for repairs or maintenance needed to make the vessel ready for the next charter.  AYC was required to make every reasonable effort to contact petitioners before authorizing repairs or maintenance in excess of $500, or to provide notice at the first opportunity if contact was not possible.

[9]  Petitioners elected to pay the optional turn fee (which provides that AYC personnel will clean <u>Moonshadow</u> after every charter) because "being that it's [<u>Moonshadow</u>] located where it is, it would be--and we work full time--it makes sense to have them [AYC] take care of it for us."

the start and finish dates, the number of charter days, the charter income, and the charter expenses.  At the end of each year, AYC would also mail petitioners a yacht owners' annual summary worksheet showing the monthly figures totaled for the full year by income, charter expenses, and maintenance and other expenses.  These reports demonstrate that AYC arranged 13 charters for a total of 92 charter days in 1999 and 15 charters for a total of 97 charter days in 2000.[10]

In addition to the services provided by AYC, petitioners performed various services for their sailboat charter business. For example, during the charter season petitioners would check on the sailboat, wash the rugs, and perform maintenance.[11] Specifically, in 1999 petitioners performed a major repair to their sailboat when they installed a new windlass.  At the end of the charter season, petitioners would meet with the charter representative to review the postseason report, which lists any problems on the sailboat, the status of the systems, the inventory on board, the hull condition, and any cosmetic problems.  During the off-season, petitioners would work on any problems noted in the postseason report, conduct engine

---

[10]  In 1999, petitioners charted Moonshadow for a total of 12 charter days; in 2000, they charted Moonshadow for a total of 7 charter days.

[11]  AYC's charter season is typically the last week of May through the end of September.

maintenance, refinish the interior, wax the sailboat, and switch the pumps.  During the preseason, petitioners would conduct a maintenance check, which AYC would verify based on a preseason readiness checklist.  Petitioners also rented a storage locker in the marina building where they stored proprietary parts that AYC or petitioners could use for repairs on Moonshadow.

To document their work, petitioners maintained contemporaneous handwritten logs identifying the dates that they worked on Moonshadow and the type of work completed.  The work logs indicate a timeframe for each day Mr. White or petitioners together worked on Moonshadow.  The work logs, however, do not detail the amount of time actually spent on a specific task, do not indicate which petitioner performed a particular task, and do not account for lunch breaks that petitioners testified they took during the day.

Petitioners timely filed a Form 1040, U.S. Individual Income Tax Return, for each of the years in issue.  Petitioners attached to each return, inter alia, a Schedule C, Profit or Loss From Business (Sole Proprietorship).  On each Schedule C, petitioners identified their business name as GW Rentals and their principal business or profession as boat charters and tours.  On the Schedules C, petitioners marked "Yes" on Line G:  "Did you 'materially participate' in the operation of this business".  Petitioners reported losses from GW Rentals on the Schedules C as

follows:

| Year | Gross Income | Total Expenses | Net Loss |
|------|--------------|----------------|----------|
| 1999 | $36,273 | $41,866 | $5,593 |
| 2000 | 40,863 | 54,049 | 13,186 |

Expenses consisted of advertising, automobile expenses, commissions and fees, depreciation, insurance, mortgage, legal and professional services, repairs and maintenance, taxes and licenses, meals and entertainment, utilities, and other expenses.

In response to an audit for the years in issue, petitioners created on June 18, 2002, activity logs based on their contemporaneous work logs, receipts, photos, checkbook, and statements. These activity logs itemized the type of work petitioners allegedly performed in their sailboat charter business as follows:

| Year | Total Hours | Labor Hours[1] | Travel Time | Investment Time |
|------|-------------|-----------------|-------------|-----------------|
| 1999 | 591.25 | 390.75 | 178 | 22.5 |
| 2000 | 616.38 | 406.5 | 178.38 | 31.5 |

[1]We note that many of the activity items are improperly categorized as labor hours. For instance, attending AYC meetings and barbecues are not labor services.

In the notice of deficiency, respondent disallowed petitioners' business losses. Respondent determined that petitioners' sailboat charter business is a rental activity, and that petitioners' business losses therefore constitute passive activity losses.

Petitioners timely filed a petition with the Court disputing the determined deficiencies. Paragraph 4 of the petition states in part as follows:

Taxpayers disagree with the disallowance. Taxpayers furnished the Service numerous schedules supported by affidavits and receipts documenting that all losses in question were allowed due to material participation under Treas. Reg. 1.469-5T(a)(1) and 1.469-5T(a)(3).

The Service's primary rebuttal to abundance of documentation has been that it is not possible for the husband and wife, i.e., taxpayers Gary & Darlene White, to have worked a combined total of 18 hours in any given day. Apparently the most the Service believes that 2 people can work in one day is 16 hours! Taxpayers contend that the Service's position is unreasonable and without any authoritative support.

Discussion[12]

Generally, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Section 469 generally disallows for the taxable year passive activity losses incurred by individual taxpayers. Sec. 469(a)(1). A passive activity loss is the amount by which the aggregate losses from all passive activities for the taxable year exceed the aggregate income from all passive activities for such year. Sec. 469(d)(1)(A). A passive activity is any trade or business in which the taxpayer does not materially participate. Sec. 469(c)(1). The term passive activity includes any rental activity regardless of whether the taxpayer materially

---

[12] We decide the issue in this case without regard to the burden of proof under sec. 7491(a) because the issue is essentially one of law.

participates in the activity.  Sec. 469(c)(2), (4).  A rental activity is "any activity where payments are principally for the use of tangible property."  Sec. 469(j)(8).

As relevant herein, exceptions to the general rule that an activity involving the use of tangible property is a rental activity are:

> (A) The average period of customer use for such property is seven days or less;
>
> (B) The average period of customer use for such property is 30 days or less, and significant personal services (within the meaning of paragraph (e)(3)(iv) of this section) are provided by or on behalf of the owner of the property in connection with making the property available for use by customers;
>
> (C) Extraordinary personal services (within the meaning of paragraph (e)(3)(v) of this section) are provided by or on behalf of the owner of the property in connection with making such property available for use by customers (without regard to the average period of customer use).

Sec. 1.469-1T(e)(3)(ii)(A) through (C), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988).

The period of customer use is the period during which a customer has a continuous or recurring right to use an item of property held in connection with the activity (without regard to whether the customer uses the property for the entire period). Sec. 1.469-1(e)(3)(iii)(D), Income Tax Regs.  The average period of customer use is calculated by dividing the aggregate number of

days in all periods of customer use of the property for the year by the total number of periods of customer use for the year. Sec. 1.469-1(e)(3)(iii), Income Tax Regs.

Section 1.469-1T(e)(3)(iv), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988), defines significant personal services as follows:

> In determining whether personal services provided in connection with making property available for use by customers are significant, all of the relevant facts and circumstances shall be taken into account. Relevant facts and circumstances include the frequency with which such services are provided, the type and amount of labor required to perform such services, and the value of such services relative to the amount charged for the use of the property.

Significant personal services include only services performed by individuals and do not include excluded services as defined under section 1.469-1T(e)(3)(iv)(B), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988). As relevant herein, excluded services are defined as services necessary to permit the lawful use of the property and services performed in connection with the performance of repairs that extend the property's useful life for a period substantially longer than the average period for which such property is used by customers. Id.

Section 1.469-1T(e)(3)(v), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988), defines extraordinary personal services as follows:

> For purposes of paragraph (e)(3)(ii)(C) of this section, extraordinary personal services are provided

in connection with making property available for use by customers only if the services provided in connection with the use of the property are performed by individuals, and the use by customers of the property is incidental to their receipt of such services. * * *

Petitioners contend that several of the exceptions to the definition of a rental activity apply in this case. For 2000, petitioners contend that the average rental period was less than 7 days. For both 1999 and 2000, petitioners contend that they personally contributed significant and extraordinary personal services. On the other hand, respondent contends that the average rental period was based on the contract between petitioners and AYC as lessee, and that petitioners did not contribute significant or extraordinary personal services. We agree with respondent.

The yacht owners' contract concerning Moonshadow was an annual exclusive lease agreement between petitioners and AYC, which was automatically renewable each year unless otherwise terminated. AYC is a professional organization engaged in the charter boat business. Under the terms of the contract, petitioners leased Moonshadow to AYC, granted AYC possession, dominion, and control over Moonshadow, and gave AYC the exclusive right to sublease Moonshadow to third-party bare boat charterers for the entire year. AYC would then enter into individual charter contracts with third parties. Petitioners were not a party to the individual charter contracts, and, indeed,

petitioners were not involved with any aspect of qualifying charterers or establishing such charters.  Moreover, petitioners reserved no right to reserve Moonshadow for nonbusiness private use and agreed to pay AYC a reduced commission if they leased it for their personal use.  Under Washington State law, petitioners' contract with AYC constituted a lease agreement.  See Wash. Rev. Code Ann. sec. 62A.A2-103(1)(j) and (k) (West 2003).  Therefore, AYC's exclusive right to lease Moonshadow for a 1-year period constitutes the average rental period for purposes of section 1.469-1(e)(3)(iii), Income Tax Regs.  See Hairston v. Commissioner, T.C. Memo. 2000-386 (holding that an arrangement where taxpayers leased equipment to their corporation, which was engaged in the business of leasing such equipment to third parties, for an indefinite term over a number of years was one period of customer use for each taxable year); Kelly v. Commissioner, T.C. Memo. 2000-32 (holding that an arrangement where taxpayer leased his aircraft for 1-year periods to a company that would in turn use the aircraft or rent it to other pilots was a yearly-basis rental); Frank v. Commissioner, T.C. Memo. 1996-177 (holding that the flight training schools were the lessees where taxpayer leased his plane to flight training schools that rented the plane to customers).  Accordingly, the 7-day and 30-day exceptions under section 1.469-1T(e)(3)(ii)(A) and

(B), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988), do not apply in the instant case.

We now turn to the extraordinary services exception under section 1.469-1T(e)(3)(ii)(C), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988). Respondent asserts that petitioners did not provide extraordinary personal services in their sailboat charter business. Petitioners, however, contend that they provided extraordinary personal services by, for example, updating Moonshadow's web page on AYC's internet site, searching for and acquiring proper repair parts, performing installations, repairs (e.g., repair of windlass) and routine maintenance, and using an outstanding full-service charter broker to facilitate the check-in and embarkation process. Petitioners argue that performing extensive work on Moonshadow to keep it in pristine condition constitutes exceptional personal services.

The personal services provided by petitioners in conjunction with AYC's services clearly contributed to maintaining Moonshadow's immaculate condition and to its marketability to prospective charterers. Such services, however, are not those ordinarily contemplated under the extraordinary personal services exception. In other words, for that exception to be applicable, the use by customers of the sailboat would have to be incidental to the receipt of petitioners' personal services.

- 15 -

The legislative history of section 469 states:

furnishing a boat under a bare boat charter * * *
constitutes a rental activity under the passive loss
rule, because no significant services are performed in
connection with providing the property.  [S. Rept. 99-
313 (1986), 1986-3 C.B. (Vol. 3) 742.]

Moreover, section 1.469-1T(e)(3)(v), Temporary Income Tax Regs.,

53 Fed. Reg. 5702 (Feb. 25, 1988), provides the following

examples:

the use by patients of a hospital's boarding facilities
generally is incidental to their receipt of the
personal services provided by the hospital's medical
and nursing staff.  Similarly, the use by students of a
boarding school's dormitories generally is incidental
to their receipt of the personal services provided by
the school's teaching staff.

Section 1.469-1T(e)(3)(viii), Example (3), Temporary Income Tax

Regs., 53 Fed. Reg. 5703 (Feb. 25, 1988), further illustrates

this exception:

The taxpayer is engaged in an activity of transporting
goods for customers.  In conducting the activity, the
taxpayer provides tractor-trailers to transport goods
for customers pursuant to arrangements under which the
tractor-trailers are selected by the taxpayer, may be
replaced at the sole option of the taxpayer, and are
operated and maintained by drivers and mechanics
employed by the taxpayer.  The average period of
customer use for the tractor-trailers exceeds 30 days.
Under these facts, the use of the tractor-trailers by
the taxpayer's customers is incidental to their receipt
of personal services provided by the taxpayer.
Accordingly, the services performed in the activity are
extraordinary personal services * * * and, * * *
[thus], the activity is not a rental activity.

The underlying purpose of petitioners' business, as well as

AYC's business, is to charter Moonshadow.  During the years in

issue, petitioners exclusively leased <u>Moonshadow</u> to AYC for 1-year periods, and AYC then chartered <u>Moonshadow</u> to third parties. Under the contract, petitioners were obligated to ensure that <u>Moonshadow</u> was charter ready at the start of the charter season. As such, petitioners performed cleaning, maintenance, and repairs. During the charter season, only AYC was responsible for the day-to-day maintenance and operation of <u>Moonshadow</u>. Although petitioners were not otherwise obligated to provide services during the charter season, they did perform routine maintenance, repairs, and cleaning in addition to the same services provided by AYC. During the postseason, petitioners themselves attempted to correct any problems noted in the postseason report. On at least one occasion, petitioners performed a major repair to their sailboat when they replaced the windlass.

All of petitioners' personal services, however, were provided in connection with the use of their sailboat by AYC and AYC's third-party charterers, and such use of petitioners' sailboat was not incidental to the personal services provided by petitioners. Indeed, the personal services provided by petitioners were performed in their capacity as owners of <u>Moonshadow</u> with the objective of preserving their investment in the sailboat. Although prospective charterers may have selected <u>Moonshadow</u> because of its pristine condition, a charterer's objective is to rent a well-maintained sailboat rather than to

obtain a sailboat incidental to the receipt of petitioners' cleaning, maintenance, and repair services.  Therefore, we conclude that petitioners did not contribute extraordinary personal services to their sailboat charter business during the years in issue.

Accordingly, we sustain respondent's determination disallowing petitioners' business losses.

We have considered all of petitioners' arguments, and, to the extent that we have not specifically addressed them, we conclude they are without merit.

Reviewed and adopted as the report of the Small Tax Case Division.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent.</u>